(June 5, 1909.)

EVA E. LAMB, Admx., Respondent, v. B. LICEY et al., Appellants.

[102 Pac. 378.]

FLAG-POLE—ERECTION AND MAINTENANCE OF—BREAKING OF—EXTRAORDINARY WIND—INJURY TO PERSON.

1. No liability attaches for damages sustained by reason of an act of God or forces of nature.

2. *Held*, under the facts of this case that the defendants did not negligently erect or carelessly, negligently or wrongfully maintain the flag-pole which was the cause of the accident complained of in this action.

3. *Held*, under the facts of this case that the defendants are not liable.

4. Under the provisions of sec. 4824, Rev. Codes, 1909, when there is substantial evidence to support the verdict, the same will not be set aside on appeal.

(Syllabus by the court.)

APPEAL from the District Court of the Third Judicial District for Boise County. Hon. Fremont Wood, Judge.

Action by an administratrix to recover for alleged damages sustained by reason of the falling of a flag-pole and injuring the plaintiff's intestate so that he died. Judgment for the plaintiff. *Reversed.*

Hawley, Puckett & Hawley, for Appellants.

"A lodge is not liable in an action for an act of wrong outside of the declared and real purposes of the association, for such wrongful act stands by itself to be answered for only by those who joined in its perpetration." (Bacon on Benefit Societies and Life Insurance, par. 441, p. 890.)

The strongest requirement on the erection of the pole was that it should withstand the ordinary force and power of ordinary and usual windstorms in the vicinity where erected. (*City of Alleghany v. Zimmerman*, 95 Pa. 287, 40 Am. Rep. 649; Thompson on Negligence, par. 1241; 29 Cyc. 441; *Texas etc. R. R. Co. v. Anderson* (Tex. Civ. App.), 61 S. W. 424.)

"Where the negligence of the defendant creates the dangerous condition, the plaintiff cannot recover, if notwithstanding the negligence he could have avoided the injury of which it was the occasion by the exercise of ordinary or reasonable care." (1 Thompson on Negligence, p. 489; *Dexter v. McCready*, 54 Conn. 171, 5 Atl. 855; 29 Cyc. 513.)

Karl Paine, and H. L. Fisher, for Respondent.

"A member is responsible for tortious acts committed by the association when it can fairly be assumed that they were within the scope of the purposes for which the organization was formed." (4 Cyc. 312. See note 65.)

The case was tried upon the theory that the defendants were not copartners. Assuming that it was not, the camp had no well-defined legal status, but consisted of a collection of individuals, part of whom were made parties defendant. It was not a separate entity and could not be sued as such. The members thereof had the right to manage, control and dispose of its property as joint owners thereof. They permitted the pole to be placed on their property and aided in erecting it there. They had the undoubted right to remove it at pleasure, and such right was exclusive in them. Granted that other persons used it, the members of the order had the exclusive control of it. Under these circumstances, they will not be heard to say that they were not maintaining the

pole. (*Weller v. McCormick,* 52 N. J. L. 470, 19 Atl. 1101, 8 L. R. A. 798; *Waller v. Ross,* 100 Minn. 7, 117 Am. St. 661, 110 N. W. 252, 12 L. R. A., N. S., 721.)

SULLIVAN, C. J.—This action was commenced by the respondent, as plaintiff, to recover $20,000 damages against the appellants for the alleged wrongful death of the respondent's husband, by reason of the careless, negligent and wrongful maintenance of a flag-pole. The principal allegations of the complaint were that the defendants and others were members of the local camp of Modern Woodmen of America at the village of Sweet in Boise county, which camp, it is alleged, is a voluntary unincorporated association securing life insurance to its members and promoting their social and fraternal interests, and that as such members they were in possession of a building known as the Woodmen's Hall; that they, as such members, carelessly, negligently and wrongfully maintained a flag-pole in front of and in connection with said hall; that the said flag-pole rotted at a point near where it emerged from the ground, and the rotted and decayed condition thereof by the exercise of ordinary care on defendants' part could have been ascertained; that the plaintiff's intestate lived so close to the pole that the defendants were bound to know that the pole in falling might injure or kill said intestate; that the pole did break off at the point where rotted and decayed, and in falling did kill said intestate. Then follows the usual allegation of damages.

The defendants demurred to the complaint on several grounds: First, on the ground that the complaint did not state facts sufficient to constitute a cause of action; second, that there is a defect of parties defendants and that the complaint is ambiguous, specifying wherein the ambiguity exists. The court overruled the demurrer. In their answer several of the defendants denied practically *in toto* the allegations of the complaint, and as a further answer, that they had joined said Woodmen Lodge since the death of said intestate. The answer of the other defendants was a practical denial of all of the material allegations of the com-

plaint, while both answers pleaded that the flag-pole was
erected by the people generally in the vicinity of Sweet, and
was used as a liberty pole by the whole people of the vicinity;
that it was not erected by or at the cost of the said Woodmen
Camp; that the pole was carefully selected and no decay
appeared thereon; that as an inevitable act of God the pole
fell, blown down by an extremely high wind; that the de-
ceased had equal opportunities with all, and better than most
of the defendants, to inspect and notice the condition of the
pole, and voluntarily erected his tent in its proximity.
Allegations of contributory negligence on the part of the
intestate were made, as well as allegations as to the lack of
negligence on the defendants' part.

The case was tried by the court with a jury and the jury
returned a verdict of $3,600 in favor of plaintiff; $600 in
favor of the widow, $800 in favor of Myrtle R., $1,200 in
favor of Walter W., and $1,000 in favor of Pearl Lamb,
children of said deceased.

During the trial a motion was made to dismiss as to the
defendants who joined said society subsequent to the death
of said intestate, which motion was sustained. A motion for
a new trial was overruled and the appeal is from the judg-
ment and the order denying a new trial.

Numerous errors are assigned, but in our view of the
matter it will not be necessary to pass upon each assignment
separately.

The complaint is framed upon the theory that the members
of said Woodmen's Lodge are liable because that lodge care-
lessly and negligently maintained said flag-pole. After
alleging that said defendants are members of said Woodmen
Lodge, and that they were in possession of a certain building
in the said village of Sweet, commonly known as the Hall of
the M. W. A., it is alleged as follows: "And as such mem-
bers were then and there and for a long time prior thereto
had been carelessly, negligently and wrongfully maintaining
in front of and in connection with said hall a long and very
heavy pole which they used as a flag-pole and on and from
which on divers occasions prior thereto have raised and hung
the flag of the United States." The case was tried by the

plaintiff upon the theory that said lodge, or the members thereof, were liable for the damages resulting in the death of said deceased. During the trial it appeared from the evidence that several of the defendants named had joined said Woodmen Lodge subsequent to the death of the intestate, and on motion the court granted a nonsuit or dismissed the action as to them, and as to those who were members of said lodge before the pole was erected the motion for nonsuit was denied. It is thus made to appear that the respondent sought to hold the members of said Woodmen Lodge liable for the death of her intestate.

It clearly appears from the evidence that said society, as a society, never had anything whatever to do with the purchase and erection of said pole. It was erected in the street about ten feet in front of the Modern Woodmen Society's building. It appears that a subscription was taken up by a person who was not a member of said society, for the purchase and erection of said flag-pole; that nearly all of the citizens in the community contributed something for that purpose,—from twenty-five cents to two dollars each; that a number of the members of said society contributed to the expense of the purchase and erection of said pole, but not as members of such society, but simply as other citizens had contributed. The flag used on said pole was purchased by contributions from the people. It appears that the day that said pole was erected was celebrated as a holiday and the people from the surrounding country attended and speaking and other exercises were had on that day. Said pole was used as a public flag-pole and anyone who wanted to raise the flag on it did so. The raising of the flag seemed to be a public right; anyone in the community had a right to raise it. The deceased himself, during his lifetime, raised or assisted in raising the flag at different times. It was the general understanding that the pole, having been purchased and erected by the general public, could be used by anybody and everybody.

One of the witnesses testified as follows: "The flag was raised on all public occasions. The Woodmen Camp had nothing more to do with the flag-pole than the other people.

Everyone had the privilege of raising the flag. . . . . Part
of the time the flag was in the hall, because it was a con-
venient place. Part of the time it was in our store and part.
of the time in my home. . . . . The last time the flag was
raised was September 29, 1906. John Brown and Mr. Lamb
(the intestate) raised it. There was a Democratic conven-
tion there.''

One Dennis Crowley, not a Woodman, controlled the plac-
ing of the pole. It further appears that the pole was
carefully examined at the time it was set, that it was a
black pine pole containing pitch up for about seven feet
from the bottom, and it further appears that poles like that
in that vicinity had lasted for many years set in the ground.
The deceased lived near the pole in a tent and had lived
there from April 10 up to October 11, the date of the
accident. He had assisted in raising the flag on that pole;
he had often lounged around the pole and even leaned against
it. The wind which blew down the pole was the most severe
ever known in that region of the country—was of unprece-
dented velocity, causing much damage and destruction of
property. The sheriff of Boise county, who was neither a
Woodman nor a resident of the town of Sweet, testified as fol-
lows: ''I have lived in Boise county for thirty-six years, and
am familiar with Sweet and vicinity, and never at any time
since my residence in the county was there a storm approach-
ing in intensity to that storm.'' Another old resident testi-
fied as follows: ''It was the hardest wind I had ever seen
since I have been in the country; the dust was so thick you
could not see a person ten feet.''

It will be observed from the foregoing that said Woodmen
society had nothing whatever to do with the erection or main-
tenance of said flag-pole; that the allegations of the com-
plaint to the effect that the defendants, as members of said
society, ''were then and there and for a long time prior
thereto had been carelessly, negligently and wrongfully main-
taining in front of and in connection with said hall a long
and very heavy pole,'' is not sustained by the evidence in
any particular, for the evidence clearly shows that they, as

members of said society, had nothing whatever to do with the purchase, erection or maintenance of said pole.

An exhibit, consisting of a .part of said pole where it had broken, was introduced in evidence. This exhibit shows that the pole was considerably rotted just underneath the surface of the ground, but might have withstood the ordinary storms of that region of the country for many years, as it had only been in the ground about five or six years, and the evidence shows that poles of that kind in that region of country had withstood the action of the soil and the weather for from twenty to thirty years.

The windstorm that caused the falling of the pole was one of unprecedented velocity and intensity. A wagon spoke was blown through a window; trees were blown down; a pine tree two feet in diameter was broken off four or five feet from the ground; header boxes, weighing from 900 to 1,000 pounds, were picked up and dashed to the ground and broken in pieces; a barn was blown away; a shed barn, 18 by 40 feet, was unroofed; a hay-rack, weighing six or seven hundred pounds, standing on a wagon, was picked up and carried 147 feet from where the wagon stood, and badly broken. It appears from the record that the pole was blown down by a very severe windstorm for that region and that said storm was the immediate cause of the damage done. It further appears that the general public was responsible for the erection and maintenance of said pole and not the Modern Woodmen of America Society, as that society, as a society, had nothing whatever to do with the erection and maintenance of it. The evidence shows that the death of plaintiff's intestate was caused by the extraordinary disturbances of nature,—of violent wind, commonly called the act of God, and that the death of the intestate was not caused by reason of the negligence and carelessness of the defendants in maintaining said flag-pole or by any act or omission on the part of the defendants. The record shows that said intestate established his tent wherein he resided within reach of said pole, and that he had every opportunity that any of the defendants had of discovering the condition of said pole. He had lived within a few feet of it from April to October;

he had sat on the sidewalk near the pole, and was no doubt of the same opinion as others in regard to the strength and ability of said pole to withstand the winds of that region of country. While the accident was a very unfortunate and sad one, the record fails to show that the appellants were in any manner responsible for it.

For the reasons above suggested, it is not necessary for us to pass upon the other assignments of error. It is provided by sec. 4824, Rev. Codes, 1909, among other things, that whenever there is substantial evidence to support a verdict, the same shall not be set aside on appeal. In this case we find there is no substantial evidence to support the verdict, and it must therefore be set aside. As the record shows the respondents could not recover in this case, it would be useless to order a new trial. The judgment is therefore set aside and the cause remanded, with instructions to the district court to enter judgment in favor of the defendants. Costs of this appeal are awarded to appellants.

Stewart and Ailshie, JJ., concur.